IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

DEC − 3 2009

CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| SHIPBUILDERS COUNCIL OF<br>AMERICA, INC., et al.,<br>    Plaintiffs, | ) ) ) ) | |
| v. | ) ) | Case No. 1:07cv1234 |
| UNITED STATES DEPARTMENT OF<br>HOMELAND SECURITY, et al.,<br>    Defendants, | ) ) ) ) | |
| MATSON NAVIGATION COMPANY, INC.,<br>    Defendant-Intervenor. | ) ) | |

## MEMORANDUM OPINION

In this Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, suit, plaintiffs

challenge a Coast Guard decision to issue a certificate of documentation with a coastwise

endorsement to a vessel that underwent significant rework in a foreign shipyard. More precisely,

the aft end of the *M/V Mokihana*, owned by Intervenor Matson Navigation Company, Inc.

("Matson"), was converted in a Chinese shipyard from an area for container storage to a lower

garage for vehicle storage. On the basis of submissions by Matson, the Coast Guard decided that

this work did not amount to a foreign rebuilding of the vessel under the Second Proviso to the

Jones Act, 46 U.S.C. §§ 12101, 12132. At issue here is whether this decision was "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. §

706(2)(A).

### I.

### A.

An understanding of the statutory and regulatory framework governing coastwise trading

privileges is essential to an assessment of the Coast Guard's decision in this case. In 1920,

Congress enacted the Merchant Marine Act, commonly known as the Jones Act, to shelter the

American shipping industry from foreign competition "[b]ecause building ships and manning

them in the United States was and remains more expensive than in other countries." *OSG Bulk

Ships v. United States*, 132 F.3d 808, 809 (D.C. Cir. 1998). In particular, Congress limited the

coastwise trade—that is, trade between points in the United States—to vessels built in American

shipyards and owned by American citizens. *See* Jones Act, ch. 250, § 27, 41 Stat. 988, 999

(1920) (codified as amended at 46 U.S.C. § 55102 (2006)). In 1956, Congress added the Second

Proviso to Section 27 of the Jones Act, which prohibited vessels that had been "rebuilt" abroad

from engaging in the coastwise trade. Act of July 14, 1956, ch.600, § 1, 70 Stat. 544, 544

(codified as amended at 46 U.S.C. § 12132).[1] Yet, shipowners sought to end-run the Second

Proviso by having large ship sections constructed abroad, towed to the United States, and

installed by American shipyards into coastwise-eligible vessels. Seeking to close this loophole,[2]

Congress amended the Second Proviso in 1960 to specify that the foreign construction of any

major component of a vessel's hull or superstructure renders the vessel ineligible for coastwise

trading. Act of July 5, 1960, Pub. L. No. 86-583, § 1, 74 Stat. 321, 321. As codified by

---

[1] The Senate Report recommending the passage of the bill containing the Second Proviso stated that it "was designed to assist the shipyards of the United States by making applicable to vessels rebuilt in foreign yards the historic policy of exclusion from the coastwise trade which has always applied, with certain exceptions, to vessels constructed outside the United States." S. Rep. No. 84-2395, at 1 (1956), *as reprinted in* 1956 U.S.C.C.A.N. 3162, 3162.

[2] H. Rep. No. 86-1887, at 1 (1960), *as reprinted in* 1960 U.S.C.C.A.N. 2664, 2664 ("The purpose of this bill is to amend existing law to close a loophole therein which would permit a frustration of the intent of Congress that vessels of foreign construction shall not be permitted to operate in the coastwise trade of the United States.").

Congress in 2006, the Second Proviso appears, as follows:

> A vessel eligible to engage in the coastwise trade and later rebuilt outside the United States may not thereafter engage in the coastwise trade.
>
> [A] vessel is deemed to have been rebuilt in the United States only if the entire rebuilding, including the construction of any major component of the hull or superstructure, was done in the United States.

46 U.S.C. §§ 12132(b), 12101(a).[3] Thus, under the Jones Act, if a vessel is "rebuilt," the entire rebuilding must be done in the United States if the ship is to retain its eligibility for the coastwise trade.

In 1996, the Coast Guard promulgated a regulation governing when a vessel has been rebuilt outside of the United States. In particular, the regulation provides that a vessel is "rebuilt foreign" (a) when "a major component of the hull or superstructure not built in the United States is added to the vessel" or (b) when a "considerable part" of the hull or superstructure has been "built upon or substantially altered outside of the United States." 46 C.F.R. § 67.177. These tests are commonly referred to as the "major component" and "considerable part" tests. Although the term "major component" is defined neither by statute nor regulation, the Coast Guard has traditionally found that objects weighing in excess of 1.5% of the vessel's discounted

---

[3] Prior to the 2006 codification, the Second Proviso read, as follows:

> *Provided further*, That no vessel which has acquired the lawful right to engage in the coastwise trade . . . and which has later been rebuilt, shall have the right thereafter to engage in the coastwise trade, unless the entire rebuilding, including the construction of any major component of the hull or superstructure of the vessel, is effected within the United States, its Territories (not including trust territories), or its possessions.

46 U.S.C. App. § 883 (2000). Congress stated that its intent in the 2006 codification was "to conform to the understood policy, intent, and purpose of the Congress in the original enactments." Act of Oct. 6, 2006, Pub. L. No. 109-304, § 2, 120 Stat. 1485, 1485.

lightship weight are major components.[4]  With regard to the considerable part test, the Coast

Guard determines whether a considerable part of the hull or superstructure has been worked upon

by comparing the amount of work performed on the hull or superstructure to the vessel's

steelweight prior to the work.[5]  Specifically, the following thresholds apply for steel vessels:

> (1) A vessel is deemed rebuilt when work performed on its hull or superstructure constitutes more than 10 percent of the vessel's steelweight, prior to the work . . . .

> (2) A vessel may be considered rebuilt when work performed on its hull or superstructure constitutes more than 7.5 percent but not more than 10 percent of the vessel's steelweight prior to the work.

> (3) A vessel is not considered rebuilt when work performed on its hull or superstructure constitutes 7.5 percent or less of the vessel's steelweight prior to the work.

46 C.F.R. § 67.177(b).

An important feature of the regulation also enables vessel owners to ascertain whether

their planned overseas work will be deemed a foreign rebuilding through a "preliminary rebuilt

---

[4] Notably, the exact method of calculation—such as whether the weight determination is made prior to, or following, a components' addition to the hull or superstructure—is a sharply contested issue in this case.

[5] Another Coast Guard regulation defines the important terms "hull" and "superstructure." A vessel's "hull" is "the shell, or outer casing, and internal structure below the main deck which provide both the flotation envelope and structural integrity of the vessel in its normal operations." 46 C.F.R. § 67.3. A ship's "superstructure" is "the main deck and any other structural part above the main deck." *Id.*  The Coast Guard has further explained that "[p]arts of the hull or superstructure include the shell plating, keel, decks, supporting bulkheads, beams, frames, girders, stringers, and other structural items." Vessel Rebuilt Determinations, 60 Fed. Reg. 17290, 17291 (proposed Apr. 5, 1995).  Work involved in installing or modifying a vessel's "inventory, equipment, furnishings, and stores" is not considered by the Coast Guard to be work performed on the hull or superstructure, nor is the installation or modification of "machinery . . . that could be removed without affecting the structural integrity of the vessel." *Id.*  Likewise, "items involved in outfitting and maintaining the vessel . . . are also not included as parts of the hull or superstructure" if work upon the items "could be performed without affecting the structural or watertight integrity of the vessel." *Id.*

-4-

determination." 46 C.F.R. § 67.177(g). After work has been completed, the regulation instructs vessel owners seeking a final determination to file the following information: (i) a detailed outline of the work performed; (ii) calculations showing the steelweight of the work performed on the vessel, the steelweight of the vessel, and comparing the two; (iii) accurate sketches or blueprints describing the work performed; and (iv) any further submissions requested. *Id.* § 67.177(e). In addition, the vessel owner must submit a separate application, in which he must certify that the vessel has not been foreign rebuilt, in order to receive a certificate of documentation with a coastwise endorsement. Shipowners potentially face forfeiture of their vessel for knowingly providing false information in this process. *See* 46 U.S.C. § 12151(b)(1) ("A vessel and its equipment are liable to seizure by and forfeiture to the Government if the owner of the vessel . . . knowingly falsifies or conceals a material fact, or knowingly makes a false statement or representation, . . . in applying for documentation of the vessel . . . ."). This statutory and regulatory framework is the lens through which the Coast Guard's decision in this matter must be viewed.

### B.

Two plaintiffs brought this action: Pasha Hawaii Transport Lines LLC ("Pasha"), a California limited liability company that operates a vessel engaged in the coastwise trade, and Shipbuilders Council of America, Inc. ("SCA"), a Virginia corporation and the largest national trade association representing the American shipyard industry. These plaintiffs named three defendants: (i) the Department of Homeland Security ("DHS"), the department of the federal government responsible for administering certain aspects of the Jones Act; (ii) the Coast Guard, the component of DHS responsible for administering certain aspects of the Jones Act; and (iii)

-5-

the National Vessel Documentation Center ("NVDC"), a unit of the Coast Guard responsible for making rebuilt determinations under 46 C.F.R. § 67.177. In addition, Matson, the owner of the *M/V Mokihana*, the vessel that was the subject of the rebuilt determination considered here, was allowed to intervene as a defendant. *See Shipbuilders Council of Am., Inc. v. U.S. Dep't of Homeland Sec.*, No. 1:07cv1234 (E.D. Va. Feb. 8, 2008) (Order).

The *M/V Mokihana*, a class C9 container vessel, was built in the early 1980s by Avondale Shipyards, Inc. in New Orleans, Louisiana. It served as a containership in foreign trade for approximately twenty years, after which it became eligible for the domestic coastwise trade.[6] During this time, the *M/V Mokihana* was unaltered, except for minor changes that mitigated local cracking problems and that allowed the vessel to accommodate different sizes of containers.

On June 15, 2004, Matson sent a letter to the Coast Guard requesting a preliminary rebuilt determination, pursuant to 46 C.F.R. § 67.177(g), for three of its vessels: the *M/V Mokihana*, the *M/V Mahimahi*, and the *M/V Manoa*. These vessels were slated to undergo alterations partly in China and partly in the United States. Matson described the proposed alterations and sought confirmation "that the proposed work does not constitute a 'foreign rebuilding'" within the meaning of the Second Proviso to the Jones Act. A.R. 1. Specifically, Matson related that it planned to modify the stern of one or more of its C9 vessels in order to accommodate a growing demand for rolling cargo between Hawaii and the continental United States. The overall project involved converting the container stowage area aft of the vessel's

---

[6] Pursuant to a contractual agreement with the Maritime Administration, the *M/V Mokihana* was restricted to engaging in foreign trade because it was built with the assistance of a federal construction-differential subsidy. *See* A.R. 8; *see also OSG Bulk Ships*, 132 F.3d at 810 (explaining restrictions).

machinery casing to a garage for automobiles and other rolling cargo, with levels both above and below deck. Matson reported that the Chinese portion of the project would consist of part of the work on the upper deck and all of the work on decks, platforms, and the side shell below the upper deck, including associated outfitting and mechanical/electrical systems. A U.S. shipyard would then complete work on the upper deck and construct a five-level automobile garage above deck. In addition to describing the project and including sketches of the proposed work, Matson provided an estimate for the overall steelweight of the vessel (12,097 LT) and a summary of steelweight estimates for the work to be performed on the vessel. Specifically, Matson estimated that the steel work performed overseas on the vessel's hull or superstructure would weigh 815.5 LT, or 6.7% of the vessel's steelweight; Matson included in that figure the weight of auto platforms and ramps that would be added below the main deck and excluded work it categorized as non-structural.

On June 23, 2004, the Coast Guard sent a letter to Matson providing a preliminary determination, based on Matson's submissions, that the proposed modifications would not constitute a foreign rebuilding. In doing so, the Coast Guard accepted Matson's representation of the vessel's steelweight and its categorization of what work was relevant to the foreign rebuilt inquiry, ultimately concluding that the steel work to be performed in China on the vessel's hull or superstructure would constitute 6.7% of the vessel's steelweight, a figure below the 7.5% regulatory threshold for "clearly permissible work." A.R. 9. The Coast Guard did not consider in its preliminary determination whether a foreign-built major component of the hull or superstructure would be added to the vessel.

As Matson's designs crystallized, Herbert Engineering Corporation ("Herbert"), the

-7-

engineering firm engaged by Matson to design the garage, wrote the Coast Guard on April 25, 2005, seeking confirmation that certain proposed work would be considered "outfitting" work and therefore could be excluded from the 46 C.F.R. § 67.177(b) calculation of the steel work performed on the vessel's hull or superstructure. Specifically, Herbert sought confirmation that the following items were properly considered part of the vessel's outfitting: (i) water-tight doors; (ii) hoistable car decks; (iii) cell guides for container storage; (iv) prefabricated ramps that would be bolted in place and/or set in foundations; and (v) liftable car deck panels that would be bolted in place and/or set in foundations. On June 8, 2005, following Herbert's submission of additional design details, the Coast Guard responded by letter, indicating that although the installation of new water-tight doors would constitute work performed on the vessel's hull, the addition of the other items would be considered outfitting work.

On October 26, 2006, Matson wrote the Coast Guard seeking another preliminary determination because it had executed construction contracts and finalized the scope of the work, which facilitated calculation of "weight estimates [that] are more accurate." A.R. 28.[7] Although the description of the planned project was substantially the same as initially submitted, Matson revised its estimate of the amount of steel work that would be performed overseas on the vessel's hull or superstructure, stating that the relevant work would weigh 974.8 LT, or 8.1% of the vessel's steelweight prior to the work. The next day, on October 27, 2006, Pasha requested that the Coast Guard reconsider the preliminary determination given to Matson on June 23, 2004, and SCA sent a letter in support of that request on October 30, 2006. On November 2, 2006, the

---

[7] In this letter, Matson also informed the Coast Guard that work would only be performed on the *M/V Mokihana* and not either of its two sister vessels.

Coast Guard advised Pasha and SCA that the preliminary determination issued to Matson on June 23, 2004, was "no longer subject to review or reconsideration." A.R. 47.[8] The same day, Matson withdrew its October 26, 2006 request for a second preliminary determination before receiving a response from the Coast Guard.

On August 13, 2007, Matson submitted a request for a final determination that the *M/V Mokihana* had not been rebuilt outside the United States. At that point, after spending more than one hundred days in the Cosco Yard in Nantong, China, the vessel was at a shipyard in Alabama for the second phase of the bifurcated project. Matson again stated that the overall project involved converting the container stowage area aft of the vessel's machinery casing to a structure for rolling cargo both above and below deck. The upper trailer deck and the second deck would support either automobiles or large rolling stock, while only automobiles would be carried in a five-level garage above the upper trailer deck and on platforms below the second deck. The rolling cargo would enter the vessel from a new opening on the vessel's starboard side at the second deck level. Matson reported that the work that had been completed in the Chinese shipyard included part of the work on the upper trailer deck, part of the work on the side shell below that deck, and all of the work on decks and platforms below the upper trailer deck; the Chinese shipyard had also performed repair work in the forward container holds and modifications to forward deep tanks and double bottom tanks. Matson further stated that a U.S.

---

[8] Approximately two weeks after the Coast Guard denied their request for reconsideration, Pasha and SCA filed suit challenging the agency's June 23, 2004 preliminary determination that the modifications proposed by Matson would not constitute foreign rebuilding. Their suit was dismissed for lack of subject matter jurisdiction on the ground that the Coast Guard's preliminary determination did not constitute "final agency action" within the meaning of the APA, 5 U.S.C. § 704. *See Shipbuilders Council of Am., Inc. v. U.S. Dep't of Homeland Sec.*, 481 F. Supp. 2d 550 (E.D. Va. 2007).

shipyard would be (i) completing the upper trailer deck and the side shell below this deck, (ii)

constructing an automobile garage above the upper trailer deck, and (iii) installing a fixed ballast.

In addition to describing briefly the overall project and the split of work between the

Chinese and U.S. shipyards, Matson directly addressed the regulatory criteria governing foreign

rebuilt determinations.  First, Matson asserted that no "major component of the hull or

superstructure" had been added to the vessel:

> No modules or sections were added to the Vessel in China that could be considered
> either 'major' or a 'component' under prior Coast Guard precedents.  The largest
> item lifted on the Vessel in the China shipyard weighed approximately 26.9 metric
> tons, or 0.22% of the discounted steel weight of the Vessel.

A.R. 70.  Second, Matson stated that the portion of the project performed in China did not

represent work on a considerable part of the vessel's hull or superstructure because the amount of

relevant work was less than 7.5% of the vessel's steelweight prior to the work.  Specifically,

Matson provided summaries of the weight of major work items and reported that the "total

structural steel added in China to the hull or superstructure of the Vessel is 891.0 LT," which

Matson said represented 7.37% of the vessel's steelweight, estimated at 12,097 LT, prior to the

work.  A.R. 71.  This figure did not include the weight of auto platforms and ramps installed

below the second deck, although those items had been included in Matson's calculation of the

relevant steel work in its 2004 request for a preliminary determination.  Matson explained its

decision to exclude this weight by stating that previous Coast Guard rulings—namely,

correspondence its engineering firm, Herbert, had received from the Coast Guard—had

determined that such items were not part of the hull or superstructure.

Even before Matson had submitted its request for a final rebuilt determination, Pasha and

-10-

SCA repeatedly wrote the Coast Guard to challenge Matson's assertion that its vessel had not

been rebuilt outside the United States. Plaintiffs questioned, among other things, Matson's

representations regarding the quantity of the work that had been performed on the vessel's hull or

superstructure in China. Because of this factual discrepancy, the Coast Guard's NVDC referred

all of the information submitted by both Matson and its opponents to the Coast Guard's Naval

Architecture Division ("NAD"), asking that unit to assess the accuracy of Matson's steelweight

calculations.[9]

    On October 23, 2007, following the NAD's review, the Coast Guard issued both a final

determination that the *M/V Mokihana* had not been rebuilt foreign and a certificate of

documentation with a coastwise endorsement. The Coast Guard's conclusion that the vessel had

not been rebuilt outside the United States rested on two findings: first, stating that "by long-

established practice of the Coast Guard, only components added to the vessel which amount to

1.5 percent or more of the vessel's steelweight, prior to the addition, are considered major

components," the Coast Guard found that no "major component" had been added to the vessel

because the largest item lifted onto the vessel in the Chinese shipyard weighed approximately

26.9 metric tons, or 0.22% of the vessel's discounted steelweight. A.R. 243, 246. Second,

finding no credible basis to reject Matson's representation that the steel added to the vessel's hull

---

[9] In its referral, the NVDC stated that it would not rely on the NAD for a determination of "the ultimate legal and regulatory issues here." A.R. 215. Specifically, the NVDC advised the NAD that "[w]e do not, for example, ask or expect you to opine on whether or not 'major components' have been added to the vessel, as that term is used in the statute and regulation." *Id.* Additionally, the NVDC told the NAD to assume that the NVDC would adhere to its practice of basing the calculation of the weight of the work performed on the vessel's hull or superstructure on the greater of the weight of the steel removed or steel added, rather than the net effect of the steel removed and added or the aggregate of steel removed and added. *See id.*

-11-

or superstructure in China represented 7.37% of the vessel's steelweight prior to the work, the Coast Guard determined that no considerable part of the hull or superstructure had been built upon or substantially altered pursuant to 46 C.F.R. § 67.177(b)(3).

In sum, the *M/V Mokihana* spent over one hundred days in a Chinese shipyard. During that time, the aft end of the vessel—a distance of approximately 267 feet—underwent significant rework. Workers in the Chinese shipyard essentially gutted the aft end of the vessel, raised its side shell, and added the platforms, decks, and ramps that constitute a lower garage. In addition, Chinese workers prepared the vessel for the second phase of the bifurcated project—the installation of an upper garage in a U.S. shipyard. The Coast Guard decided that this work did not amount to a foreign rebuilding that would preclude the *M/V Mokihana* from engaging in the coastwise trade.

Pasha and SCA filed this action on December 10, 2007, to obtain judicial review of the Coast Guard's decision and a remand of the matter to the Coast Guard with instructions to revoke immediately the *M/V Mokihana*'s coastwise endorsement. The parties' threshold jurisdictional motion to dismiss and cross-motions for summary judgment on the merits were fully briefed and argued.[10] By Order dated September 30, 2008, plaintiffs' cross-motion for summary judgment was granted, and defendants' and Matson's cross-motions were denied. *See Shipbuilders*

---

[10] Defendants filed a motion to dismiss for lack of jurisdiction, which was argued at a March 28, 2008 hearing. Disposition of the motion was deferred by Order dated April 4, 2008, because "[t]he arguments advanced by the parties made clear that appropriate disposition of the motion to dismiss requires a fuller presentation of the merits of the parties' arguments." *Shipbuilders Council of Am., Inc. v. U.S. Dep't of Homeland Sec.*, No. 1:07cv1234 (E.D. Va. Apr. 4, 2008) (Order). Following submission of briefs and arguments on the parties' cross-motions for summary judgment, the matter was taken under advisement. *See Shipbuilders Council of Am., Inc. v. U.S. Dep't of Homeland Sec.*, No. 1:07cv1234 (E.D. Va. June 20, 2008) (Order).

*Council of Am., Inc. v. U.S. Dep't of Homeland Sec.*, No. 1:07cv1234 (E.D. Va. Sept. 30, 2008)

(Order). The Order further indicated that a final order would not be entered until a forthcoming

memorandum opinion issued. Subsequently, on November 5, 2008, however, this Order was

stayed pending appeal to the Fourth Circuit of *Shipbuilders Council of America v. United States*

*Department of Homeland Security (The Seabulk Trader I)*, 551 F. Supp. 2d 447 (E.D. Va. 2008),

a similar case in which a plaintiff challenged as arbitrary and capricious the Coast Guard's

decision to issue a certificate of documentation with a coastwise endorsement to a vessel that had

undergone significant work in a foreign shipyard. *See Shipbuilders Council of Am., Inc. v. U.S.*

*Dep't of Homeland Sec.*, No. 1:07cv1234 (E.D. Va. Nov. 5, 2008) (Order). In particular, the

Fourth Circuit review of the Coast Guard's application of the "major component" test in *The*

*Seabulk Trader I* was deemed potentially dispositive of the motions at bar.

The Fourth Circuit issued its opinion in the *Seabulk Trader* case on August 21, 2009.

*Shipbuilders Council of Am. v. U.S. Coast Guard (The Seabulk Trader II)*, 578 F.3d 234 (4th Cir.

2009). Accordingly, the November 5, 2008 stay in this case was appropriately lifted and the

parties were called upon to submit simultaneous briefs addressing whether, if at all, the Fourth

Circuit's decision affects the issues currently pending in the instant case.[11] The effect of the

Fourth Circuit's decision has now been fully briefed, and accordingly the parties' motions and

---

[11] The stay was initially lifted on September 8, 2009. *See Shipbuilders Council of Am.,
Inc. v. U.S. Dep't of Homeland Sec.*, No. 1:07cv1234 (E.D. Va. Sept. 8, 2009) (Order). Yet, on
joint motion by the parties, and as a matter of grace, the matter was again stayed pending the
parties' decision to seek panel rehearing or en banc rehearing in the Fourth Circuit pursuant to
Rules 35 and 40, Fed. R. App. P. *See Shipbuilders Council of Am., Inc. v. U.S. Dep't of
Homeland Sec.*, No. 1:07cv1234 (E.D. Va. Sept. 15, 2009) (Order). Following the Fourth
Circuit's issuance of a final mandate pursuant to Rule 41, Fed. R. App. P., an Order issued on
October 20, 2009, once again lifting the stay and calling for supplemental briefing.

cross-motions are ripe for disposition.

## II.

At the threshold, the Coast Guard challenges jurisdiction.  Two grounds are advanced, neither of which, in the end, is persuasive.

First, the Coast Guard argues that plaintiffs' complaint is barred in part by the six-year statute of limitations applicable to APA actions.  *See* 28 U.S.C. § 2401(a).  The Coast Guard focuses this jurisdictional challenge primarily on one allegation in the plaintiffs' complaint—namely, plaintiffs' argument that when a project is performed in part abroad and in part in the United States, the Coast Guard must determine whether the project as a whole constitutes a "rebuilding" of the vessel and, if so, whether the "entire rebuilding" must be completed in the United States if the vessel is to retain eligibility for the coastwise trade.  *See* Compl. ¶ 64.  There is some force to the Coast Guard's argument that this claim is foreclosed by the applicable statute of limitations, as there appears to be some tension between the statute on the one hand, which specifies that if a vessel is "rebuilt," the entire rebuilding must be done in the United States in order for the ship to retain its coastwise eligibility, and the Coast Guard's implementing regulation on the other hand, which arguably limits the rebuilt inquiry's considerable part test to examination of the amount of work that has been performed "outside of the United States." 46 C.F.R. § 67.177.  Nonetheless, the Coast Guard errs in characterizing the plaintiffs' complaint as raising a facial challenge to the regulation because plaintiffs here challenge not the regulation itself, but the manner in which the Coast Guard interpreted its regulation in the process of determining that the *M/V Mokihana* was still eligible for a coastwise endorsement.  This determination occurred well within the statute of limitations period.

-14-

Accordingly, the defendants' argument that the plaintiffs' complaint is in part time-barred is without merit.[12]

Second, the Coast Guard argues that there is no subject matter jurisdiction over plaintiffs' claim because it is solely within the discretion of the Coast Guard to determine issues such as (i) what constitutes "a major component," and (ii) how to calculate the steel percentages used in the regulation's "considerable part" test. The APA establishes that its provision for judicial review does not apply to agency action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Yet, "[t]his exception to judicial review is a 'very narrow one,' reserved for 'those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 346 (4th Cir. 2001) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 821, 830 (1971)). For there to be no law to apply, the statute must be written "so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Furthermore, "even if the underlying statute does not include meaningful (or manageable) standards, regulations promulgated by an administrative agency in carrying out its statutory mandate can provide standards for judicial review." *Inova Alexandria Hosp.*, 244 F.3d at 346 (citation omitted).

---

[12] Defendants also briefly argue that plaintiffs' claim that the Coast Guard acted arbitrarily and capriciously when it did not consider certain work when deciding that the vessel had not been rebuilt abroad is time barred as a facial challenge to 46 C.F.R. § 67.177. This argument also fails. As plaintiffs note, they do not challenge the fact that the Coast Guard's regulation only makes work performed on the vessel's hull or superstructure relevant to the determination of whether the vessel has been rebuilt; rather, they challenge the Coast Guard's characterization of certain work that was performed on the vessel as "outfitting," as opposed to work on the hull or superstructure, a claim that is not a facial challenge to the regulation.

-15-

Here, there is no lack of "judicially manageable standards to guide meaningful review" of the Coast Guard's determination that the vessel has not been rebuilt abroad. *Menkes v. Dep't of Homeland Sec.*, 486 F.3d 1307, 1311 (D.C. Cir. 2007). Although the statute and the regulation certainly cloak the Coast Guard with authority to determine what constitutes a "major component" and "work performed on [a vessel's] hull or superstructure," that authority is not absolute and the agency's determinations must be reasonable. *See id.* at 1313 ("[T]he Director might be entitled to a good deal of deference . . . , but that does not mean the Director could make such decisions unreasonably. For example, it would be presumably arbitrary and capricious for the Coast Guard . . . to change its standards . . . without explanation."). Indeed, even defendants appear to concede that the agency's choices must be "rational" and "within the parameters of sound administration of a vague statute." Defs.' Mem. in Supp. of Mot. to Dismiss 27. Jurisdiction therefore exists to review the challenged agency action.

## III.

The parties' cross-motions for summary judgment address the merits of whether the Coast Guard correctly issued a certificate of documentation with a coastwise endorsement to the *M/V Mokihana*.[13] Specifically, at issue in this litigation are the validity of two determinations that formed the basis for the Coast Guard's conclusion that the *M/V Mokihana* was still eligible

---

[13] The summary judgment standard is well established and requires little, if any, elucidation here. In essence, summary judgment is appropriate only where, on the basis of the undisputed material facts, the moving party is entitled to judgment as a matter of law. *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). A court may consider "the pleadings, the discovery and disclosure materials on file, and any affidavits" submitted, and must draw all reasonable inferences in favor of the nonmoving party. *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 392 (4th Cir. 2009) (quoting Rule 56(c), Fed. R. Civ. P.). In any event, the parties have not identified any disputed material facts; this judicial review of the Coast Guard's foreign rebuilt determination under the APA is on the administrative record.

for a coastwise endorsement, despite the work that had been performed overseas in a Chinese

shipyard: first, the Coast Guard found that no foreign-built "major component" had been added

to the vessel; and second, it found that no considerable part of the vessel's hull or superstructure

had been built upon or substantially altered abroad because the work performed on the hull or

superstructure represented less than 7.5% of the vessel's steelweight prior to the work.  The

reasonableness of each determination is considered in turn.

### A.

The Second Proviso to the Jones Act states that if any major component of a vessel's hull

or superstructure was constructed abroad, the vessel is deemed to have been rebuilt outside the

United States and is no longer eligible to engage in coastwise trade. *See* 46 U.S.C. §§ 12101,

12132.  The implementing regulation tracks this statutory provision by stating that "a vessel is

deemed rebuilt when a major component of the hull or superstructure not built in the United

States is added to the vessel."  46 C.F.R. § 67.177(a).

In applying for a final determination, Matson told the Coast Guard that no foreign-built

"major component" had been added to the vessel because "[t]he largest item lifted on the Vessel

in the China shipyard weighed approximately 26.9 metric tons, or 0.22% of the discounted

steelweight of the Vessel."  A.R. 70.  The Coast Guard agreed.  This determination rested upon

the Coast Guard's interpretation of the word "major" in the statutory phrase "major component

of the hull or superstructure."  46 U.S.C. § 12101(a); *see also* 46 C.F.R. § 67.177(a).  As the

agency stated it in its final determination, "by long-established practice of the Coast Guard, only

components added to the vessel which amount to 1.5 percent or more of the vessel's steelweight,

prior to the addition, are considered major components."  A.R. 243.  Applying this weight

threshold to the *M/V Mokihana*'s rebuild, the Coast Guard concluded—based on Matson's

representation of the maximum lifting capacity of the Chinese shipyard—that no "major

component" was added to the vessel's hull or superstructure abroad.

Plaintiffs challenge this determination as arbitrary and capricious, contending that at least

one component of the *M/V Mokihana*'s hull or superstructure was "major" and constructed in the

Chinese shipyard. Although plaintiffs maintain that other foreign-built major components were

added to the vessel, they focus their challenge on the construction in China of the vessel's second

deck, which weighs 254.6 LT, or 2.1% of the discounted lightship weight, according to the

calculations contained in Matson's request for a final determination.

1.

In the *Seabulk Trader* case, *Shipbuilders Council of Am. v. U.S. Coast Guard (The

Seabulk Trader II)*, 578 F.3d 234 (4th Cir. 2009), the Fourth Circuit had occasion to review the

Coast Guard's interpretation of 46 U.S.C. § 12101(a) and 46 C.F.R. § 67.177(a) and its

application of the major component test. Because the Fourth Circuit's controlling decision is

dispositive of plaintiffs' claim that the Coast Guard erroneously determined that no major

component was added to the *M/V Mokihana*'s hull or superstructure in China, it is appropriate

here to recount briefly the facts and holdings of that decision.

The *Seabulk Trader*, an oil tanker, is owned by Seabulk Energy Transport, Inc. and

Seabulk Petroleum Transport, Inc. (collectively "Seabulk"). At Seabulk's request, the Coast

Guard, by letter dated May 20, 2005, issued a preliminary determination that installation of the

vessel's "inner hull" in a Chinese shipyard would not constitute a foreign rebuilding under the

Second Proviso and 46 C.F.R. § 67.177(a). Following completion of the foreign work, the Coast

-18-

Guard issued a certificate of documentation with a coastwise endorsement on May 9, 2007.

According to the Coast Guard's May 20, 2005 letter, the subject of plaintiffs' APA challenge,

"the inner hull is not a separable component because it was constructed 'by adding steel, which

was then built upon steel piece-by-piece,'" and therefore the major component test did not apply.

*The Seabulk Trader I*, 551 Fed. Supp. 2d 447, 454 (E.D. Va. 2008) (quoting Def. Opp'n, at 19).

Instead, the Coast Guard reasoned that the major component test applied only where "'a large

and discrete component . . . [is] added to the vessel.'" *Id.*; *see also id.* at 454 n.9 (quoting

intervenors' memorandum, which argued that "[t]he major-component test applies only when a

module, section, or other such component is constructed or fabricated outside the U.S. apart from

the vessel and then 'added to' the vessel."). Accordingly, under the Coast Guard's letter ruling,

where the component affixed to a vessel was separable and complete prior to its addition, the

Coast Guard applied the major component test and the 1.5% weight threshold; by contrast, where

the steel added was not a discrete component—that is, inseparable—prior to its addition, the

Coast Guard applied the considerable part test and the weight thresholds found in 46 C.F.R. §

67.177(b) (setting forth 7.5% and 10% steelweight bands to guide foreign rebuilt

determinations). Under this regulatory scheme, even though the *Seabulk Trader*'s inner hull

would have constituted a major component had it been assembled dockside and then affixed to

the vessel, the inner hull in that case was deemed not to be a major component because it was

assembled piecemeal aboard the vessel.

Applying *Skidmore*[14] deference, the district court rejected the Coast Guard's

separable/inseparable distinction as unpersuasive and "unfaithful to the text, history, and purpose

---

[14]  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

of the Second Proviso." *The Seabulk Trader I*, 551 Fed. Supp. 2d at 456. The court first

acknowledged that the Coast Guard had authority, in the absence of a statutory definition of

"major component," to develop a reasonable metric for determining when a component was

"major." Yet, it nonetheless found the metric used by the Coast Guard—namely, whether the

component was assembled before its addition to the ship, or added piece-by-piece—to be

irrelevant and thus an unreasonable basis for evaluating the major component test's applicability.

In addition, the court reasoned that the separable/inseparable distinction would result in arbitrary

application of the Jones Act. In particular, the Coast Guard's regulatory scheme was seen as

allowing shipowners to "easily frustrate the entire operation of the Second Proviso simply by

dictating the manner of installation" because "although a deck or a component of the hull can be

added to a vessel as one discrete pre-constructed structure, it surely can be added piece-by-piece,

beam-by-beam, and rivet-by-rivet." *Id.* at 455. This "loophole" was deemed contrary to the

statutory scheme, and accordingly the Coast Guard's rebuilt determination was remanded to the

agency for further proceedings.[15]

On appeal, the Fourth Circuit, by a unanimous panel, upheld the Coast Guard's

"separable/inseparable" distinction and reversed the district court's decision. *See Shipbuilders

Council of Am. v. U.S. Coast Guard (The Seabulk Trader II)*, 578 F.3d 234 (4th Cir. 2009).[16] In

---

[15] It is worth noting that the district court also found the Coast Guard's explanation why
the installation of the *Seabulk Trader*'s inner hull was not a "foreign rebuilding" under the
considerable part test to be inadequate because the Coast Guard failed to consider factors other
than the steelweight calculation. *See id.* at 457. This portion of the district court's holding was
not addressed by the Fourth Circuit.

[16] Importantly, the Fourth Circuit did not resolve the applicable level of deference
afforded to the Coast Guard's determination; rather, it simply reviewed the district court's
decision under the *Skidmore* standard, which had previously been applied. *Id.* at 242-43.

particular, the Fourth Circuit held that "the separable/inseparable distinction is a necessary part of [the Coast Guard's] holistic interpretation of the regulation" because a contrary view would create a regulatory scheme in which "separable and inseparable components would be assessed identically and a 'major component' would include any work on the vessel in excess of minimal maintenance." *Id.* at 244-45. In short, the district court's holding requiring the Coast Guard to measure separable, constituent parts of a major component against the 1.5% weight threshold "eviscerat[ed] the considerable part test," thereby contravening the "rule against superfluities," which states that all provisions of a statute must be given effect. *Id.* (citations omitted). Accordingly, the Fourth Circuit concluded that

> the agency's interpretation offers a holistic vision of the regulation that gives effect to each of its provisions, and the Coast Guard's interpretation comports with the plain language of the regulatory and statutory schemes. The interpretation is longstanding, has been consistently applied in the same manner, and comports with the congressional intent of the governing statute.

*Id.* at 245.

In sum, the Fourth Circuit's holding that the Coast Guard's separable/inseparable distinction is not arbitrary and capricious controls here. It allows the Coast Guard, by excluding from weight calculations separable components assembled aboard the vessel, to apply the major component test only when a component is essentially constructed dockside before being lifted as an integral, inseparable component onto, and affixed to, the vessel.

### 2.

Before applying the Fourth Circuit's decision in the *Seabulk Trader* case to the Coast Guard's issuance of a certificate of documentation with a coastwise endorsement to the *M/V Mokihana*, it is first necessary to determine the appropriate level of deference afforded to the

Coast Guard's interpretation of the Second Proviso and 46 C.F.R. 67.177(a).  Specifically, the

question is whether the Coast Guard's construction of "major component" in a rebuilt

determination is entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense*

*Council*, 467 U.S. 837 (1984), in which case the agency's interpretation of an ambiguous statute

receives substantial deference, or whether it should receive deference based on its "power to

persuade" under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).[17]  Notably, the Fourth

Circuit declined to reach this issue in the *Seabulk Trader* case.  *See The Seabulk Trader II*, 578

F.3d at 242-43.

Addressing the question of when the *Chevron* framework applies, the Supreme Court has

held:

> [An] administrative interpretation of a particular statutory provision qualifies for
> *Chevron* deference when it appears that Congress delegated authority to the
> agency generally to make rules carrying the force of law, and that the agency
> interpretation claiming deference was promulgated in the exercise of that
> authority.

*U.S. v. Mead Corp.*, 533 U.S. 218, 226-27 (2001); *see also A.T. Massey Coal Co. v. Holland*, 472

F.3d 148, 166 (4th Cir. 2006) (citing *Mead* for principle that "[*Chevron*] deference is limited to

circumstances where (1) Congress has given the agency authority to make rules carrying the force

of law and (2) the agency's interpretation is rendered in the exercise of that authority").  In *Mead*,

the Court addressed the level of deference properly afforded to a statutory interpretation

contained in a tariff classification ruling issued by the U.S. Customs Service.  Although the Court

---

[17] Additionally, considerable deference is afforded to an agency's interpretation of its own
ambiguous regulation under *Auer v. Robbins*, 519 U.S. 452 (1997).  As the Coast Guard
concedes, however, *Auer* deference does not apply where, as here, the "underlying regulation
does little more than restate the terms of the statute itself."  *Gonzales v. Oregon*, 546 U.S. 243,
257 (2006).

recognized that an "overwhelming number of our cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication," it emphasized that "[t]he fact that the tariff classification here was not a product of such formal process does not alone, therefore, bar the application of *Chevron*." *Id.* at 230-31. Nonetheless, the Court concluded that *Chevron* deference was not appropriate, reasoning in part that the U.S. Customs Service did not appear to intend for its classification rulings, issued as letter rulings following informal adjudication, to have the force and effect of law:

> It is difficult, in fact, to see in the agency practice any indication that Customs ever set out with a lawmaking pretense in mind when it undertook to make classifications like these. . . . [T]heir treatment by the agency makes it clear that a letter's binding character as a ruling stops short of third parties; Customs has regarded a classification as conclusive only as between itself and the importer to whom it was issued.

*Id.* at 233. Yet, although the Court concluded that *Chevron* deference was not appropriate for classification rulings, the letter rulings were nonetheless entitled to *Skidmore* deference—that is, "a respect proportional to its 'power to persuade.'" *Id.* at 235 (quoting *Skidmore*, 323 U.S. at 140).

These principles, applied here, compel the conclusion that the Coast Guard's interpretation of "major component" contained in its final rebuilt determination is entitled to *Skidmore*, not *Chevron*, deference. It is true that—just as the U.S. Customs Service possessed general rulemaking power—Congress has delegated general rulemaking authority to the Secretary of DHS with respect to several statutes, including the Jones Act and its Second Proviso; in turn, the Secretary has delegated this authority to the Coast Guard. *See* 46 U.S.C. §§ 2103-2104. Yet, there is no indication that the Coast Guard issued its final determination for the *M/V Mokihana* in the exercise of its authority to make rules carrying the force of law. The fact

-23-

that rebuilt determinations are not the product of notice-and-comment rulemaking or formal

adjudication does not, of course, necessarily make them ineligible for *Chevron* deference. *See*

*Mead*, 533 U.S. at 230-31. Nonetheless, Coast Guard rebuilt determinations should not receive

*Chevron* deference because the Coast Guard does not appear to have "set out with a lawmaking

pretense in mind" when it made determinations about whether or not a vessel had been rebuilt

abroad. *Id.* at 233. Significantly, the Coast Guard's rebuilt determinations come in private letter

rulings, which are not published and therefore not readily accessible to third parties. Moreover,

the Coast Guard has made it clear that "every rebuilt determination is evaluated on a case-by-case

basis." 60 Fed. Reg. 17290, 17291 (Apr. 5, 1995). Although prior rebuilt determinations may be

instructive to third parties to the extent they indicate the principles that guide the agency, "a

letter's binding character as a ruling stops short of third parties." *Mead*, 533 U.S. at 233.

Accordingly, Coast Guard rebuilt determinations—like the classification rulings at issue in

*Mead*—"are beyond the *Chevron* pale." *Id.* at 234.

The Coast Guard's arguments to the contrary are not persuasive. The Coast Guard first

asserts that *Mead* has been significantly clarified by *Barnhart v. Walton*, 535 U.S. 212 (2002).

Yet, the two paragraphs of the *Barnhart* opinion that address *Chevron*'s applicability serve

primarily to reinforce *Mead*'s point that the lack of notice-and-comment rulemaking is not

dispositive, a factor already taken into consideration here. *See Barnhart*, 535 U.S. at 221-22.

Further, although the Coast Guard correctly notes that courts in other circuits have relied on

language in *Barnhart* as a basis for giving *Chevron* deference to interpretations found in letter

rulings,[18] the Supreme Court has more recently reaffirmed that *Mead* still provides the test for determining when *Chevron* applies. *See Gonzalez v. Oregon*, 546 U.S. 243, 255-56 (2006) ("Deference in accordance with *Chevron*, however, is warranted only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" (quoting *Mead*, 533 U.S. at 226-27)).

As a result, the Coast Guard's interpretation of "major component" in its private letter ruling is not entitled to deference under *Chevron*;[19] rather its interpretation should receive deference under *Skidmore*, which recognized "that an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigation and information' available to the agency." *Mead*, 533 U.S. at 234 (quoting *Skidmore*, 323 U.S. at 139). Where, as here, *Skidmore* deference is applied, an agency's interpretation receives weight in proportion to its "power to persuade," as measured by factors like "the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." *Skidmore*, 323 U.S. at 140.

3.

---

[18] *See, e.g., Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272, 1279-80 (D.C. Cir. 2004) (using *Barnhart* to support application of *Chevron* deference in case where agency did not act by notice-and-comment rulemaking).

[19] Even if *Chevron* deference were applicable here, the result reached here would likely be the same. Under *Chevron*, courts first ask "whether Congress has directly spoken to the precise question at issue" and, if not, courts then determine "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 842-43. As explained here, the Coast Guard's interpretation of "major component" is persuasive under the less deferential *Skidmore* standard, and thus *a foriori* would pass muster under the more deferential *Chevron* standard.

The arguments plaintiffs make in this case with respect to the Coast Guard's application

of the major component test are identical to those raised and rejected by the Fourth Circuit in the

*Seabulk Trader* case. Indeed, SCA and defendants were parties in that litigation, and Matson

submitted an *amicus* brief as well. Accordingly, because the Fourth Circuit's decision controls

here, and the material facts of the *Seabulk Trader* case are indistinguishable, plaintiffs claims are

again without merit.

As a threshold matter, plaintiffs argue that the Coast Guard incorrectly states that its

"long-established practice" was to evaluate whether a component was "major" by considering its

weight prior to addition to a vessel. Although plaintiffs agree that the Coast Guard has

consistently used a 1.5% threshold to determine whether a foreign-built component is major, they

assert that the Coast Guard, with no explanation or rationale, introduced an unprecedented

"lifting test" by suggesting that an item must represent 1.5% of the vessel's steelweight before

being added in order to qualify as a major component. To be sure, prior letter rulings reveal that

the Coast Guard has determined that there are at least some situations when it is appropriate to

evaluate whether a component is "major" only after its pieces have been assembled on the

vessel.[20] Nonetheless, the Fourth Circuit, citing numerous Coast Guard rebuilt determination

letters, has expressly held that the Coast Guard's practice of calculating steelweight prior to

---

[20] In one letter ruling, for example, the Director of Field Activities for the Coast Guard
stated that although the 1.5% guideline is usually applied "in the context of the consideration of
single, usually large and certainly discrete components," a component can also consist of
hundreds or thousands of pieces and that, in such instances, the weight of the pieces should be
aggregated to determine whether the component is major. Coast Guard Priv. Ltr. Rul. 16713/5-3,
at 3 (Dec. 30, 2003). *But see* Coast Guard Priv. Ltr. Rul. 16713/5-2, at 1 (May 24, 2006) ("The
Coast Guard has declined to apply [the 1.5%] threshold, however, to each individual piece of
multiple pieces making up a larger component, such as individual plates comprising a vessel's
outer skin . . . .").

assembly aboard the vessel "is longstanding, has been consistently applied in the same manner, and comports with the congressional intent of the governing statute." *The Seabulk Trader II*, 578 F.3d at 245-46.

Moreover, the Fourth Circuit's decision in the *Seabulk Trader* case makes pellucidly clear that the Coast Guard did not act arbitrarily or capriciously in determining that the work done to construct the *M/V Mokihana*'s second deck did not violate the major component test. Specifically, in this case, the Coast Guard, following supplemental investigation and referral to the NAD, determined that the Chinese shipyard which performed the work was incapable of lifting more than 26.9 tons at once. *See* A.R. 245. Indeed, the Chinese shipyard confirmed that no lifts of more than 26.9 tons were made. *See id.* As this figure represented only 0.22% of the *M/V Mokihana*'s discounted lightship weight, it falls well short of the 1.5% weight threshold used by the Coast Guard in making foreign rebuilt determinations under the major component test. That the second deck, assembled piece-by-piece aboard the *M/V Mokihana*, weighed far more than 1.5% of the vessel's discounted lightship weight is irrelevant, as no constituent, separable part of the second deck exceeded the weight threshold when it was hoisted aboard the vessel. Furthermore, the Coast Guard's reliance on the lifting capacity of the Chinese shipyard is not unreasonable, as the shipyard's limitations provide conclusive proof that no major component could have been added to the *M/V Mokihana*. Accordingly, the Coast Guard's determination that the *M/V Mokihana* was not rebuilt overseas under the major component test was neither arbitrary nor capricious.

In response, plaintiffs attempt to distinguish the *Seabulk Trader* case by contending that the Coast Guard made its final rebuilt determination as to the *M/V Mokihana* using a novel

-27-

"crane lifting test" or "economic test," rather than using the separable/inseparable distinction validated by the Fourth Circuit. Plaintiffs' argument, distilled to its essence, essentially asserts that plaintiffs should not be penalized because the "cheapness of Chinese labor" allows Chinese shipyards to use less powerful cranes in comparison to other countries' shipyards. This argument plainly fails to persuade. The fact that the Chinese shipyard, which performed the work on the *M/V Mokihana*, was incapable of lifting more than 0.22% of the vessel's discounted steelweight is a factual predicate to the Coast Guard's legal determination that no major components were lifted onto the vessel. It is not, as plaintiffs argue, a new interpretation and application of the Second Proviso or 46 C.F.R. 67.177(a). In addition, the Coast Guard's application of the major component test does not, as plaintiffs suggest, turn on the foreign nations' economic realities or foreign nationals' business decisions; rather, this objective test is based solely on mathematical calculations of steelweight and shipweight. The objective nature of the test, and the Coast Guard's reliance on the separable/inseparable distinction, is made clear by the Coast Guard's final determination letter:

> [t]he largest item lifted on the Vessel in the China Shipyard . . . is well below the 1.5% of discounted steelweight that has been established by longstanding practice of the Coast Guard as the threshold for the determination of whether 'major component' had been added to the vessel in a foreign shipyard.

A.R. 244-45. This application of the major component test, which calculates the steelweight of a component's pre-assembly separable parts, is indistinguishable from the calculation method validated by the Fourth Circuit in the *Seabulk Trader* case.

In sum, the Coast Guard's practice of measuring a component's steelweight prior to its addition to the vessel has been deemed reasonable in this circuit. Because in this case the *M/V*

*Mokihana*'s second deck was built piece-by-piece, with no piece exceeding the 1.5% discounted lightship weight threshold, this second deck is not a disqualifying major component. Accordingly, the Coast Guard correctly concluded that the *M/V Mokihana* was not rebuilt foreign under the major component test, and the Coast Guard's interpretation and application of 46 U.S.C. § 12101(a) and 46 C.F.R. § 67.177(a) is neither arbitrary nor capricious.

**B.**

Plaintiffs also challenge the Coast Guard's issuance of a certificate of documentation with a coastwise endorsement based on its determination that the *M/V Mokihana* was not rebuilt foreign under the considerable part test. Specifically, the Coast Guard found that no considerable part of the vessel's hull or superstructure was built upon or substantially altered abroad because the work performed on the hull or superstructure represented less than 7.5% of the vessel's steelweight prior to the work. *See* 46 C.F.R. § 67.177(b)(3). This determination must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under the arbitrary and capricious standard, "'the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *West Virginia v. Thompson*, 475 F.3d 204, 212 (4th Cir. 2007) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Although the scope of judicial review under this standard is narrow, courts nonetheless examine the following:

> whether "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

-29-

*Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Additionally, to the extent the agency's determination turns on its interpretation of the regulation, that interpretation is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997).

Plaintiffs argue that the Coast Guard's finding that the *M/V Mokihana* had not been rebuilt foreign under the considerable part test was arbitrary and capricious. Specifically, they assert four specific challenges to the finding's validity: (i) that the Coast Guard erroneously failed to include the Chinese shipyard's installation of auto platforms and ramps in its calculation of the work performed on the vessel's hull or superstructure and, more generally, abdicated its responsibility by failing to verify independently that Matson's representations regarding the foreign work were accurate; (ii) that the Coast Guard erroneously failed to include both removed and added steel in its calculation of the work performed on the vessel's hull or superstructure; (iii) that the Coast Guard relied upon an incorrect calculation of the vessel's discounted lightship weight prior to commencing construction; and (iv) that the Coast Guard incorrectly applied its considerable part test by failing to include the portion of the project completed in the Alabama shipyard. In response, defendants and Matson argue that the Fourth Circuit's acknowledgment of the agency's expertise in the *Seabulk Trader* case includes a generous grant of discretion in making rebuilt determinations under the considerable part test. Yet, the Fourth Circuit's decision did not reach the district court's analysis of the considerable part test, and thus defendants may not infer that the Coast Guard's rebuilt determinations are presumed correct. Nor can the Fourth Circuit's decision be read to confer essentially unfettered discretion on the Coast Guard because, as noted above, there is no lack of "judicially manageable standards to guide meaningful review"

of the agency's rebuilt determinations. *Menkes v. Dep't of Homeland Sec.*, 486 F.3d 1307, 1311

(D.C. Cir. 2007). Accordingly, it is appropriate to consider plaintiffs' challenges in turn.

## 1.

Plaintiffs first complain that the Coast Guard acted arbitrarily and capriciously when it

accepted Matson's exclusion of auto platforms and ramps from the calculation of work

performed on the hull or superstructure. Although Matson, in its request for a preliminary

determination, had initially included the weight of these items in its calculation of the overseas

work that would be performed on the hull or superstructure, it later excluded these items from its

calculation in its request for a final determination, stating that "independent car deck panels

below the Second Deck (auto platforms 1, 2, 3, in Exhibit 2) and ramps have all been determined

by previous Coast Guard rulings not to be part of the hull or superstructure for purposes of the

rebuilding analysis." A.R. 70. Specifically, Matson cited letters from the Coast Guard dated

May 3, 2005, and June 8, 2005, in which the agency informed Matson's engineers, albeit without

explanation, that it considered "hoistable car decks," "prefabricated ramps," and "independent

'liftable' car deck panels for some of the auto decks" to be "outfitting." As a result, installation

of these items would not be deemed part of the work on the hull or superstructure. *See* A.R. 11,

15, 26.[21]

---

[21] Plaintiffs challenge Matson's reliance on these Coast Guard letters to support its
exclusion of the auto platforms as "outfitting," arguing that the challenged auto platforms are
neither the "hoistable car decks" nor the "independent 'liftable' car deck panels for some auto
decks" that the Coast Guard approved as "outfitting." It appears, however, that the challenged
auto platforms were made up of the car deck panels found to be outfitting, and therefore are
covered by the Coast Guard letters of May 3, 2005, and June 8, 2005. This conclusion finds
further support in NAD's statement that "the NVDC subsequently determined that the platforms
are considered 'outfitting' and not subject to the steel weight limitation." A.R. 248.

The Coast Guard's final rebuilt determination accepted Matson's representation of the amount of work that had been performed on the vessel's hull or superstructure abroad, thereby implicitly accepting that the addition of auto platforms and ramps constituted outfitting rather than work on the hull or superstructure.  In this respect, the Coast Guard made no clear error of judgment; this work was appropriately excluded from the calculation of the work performed on the vessel's hull or superstructure called for in 46 C.F.R. § 67.177(b).  When the Coast Guard first proposed the current regulation, it stated that "many items involved in outfitting and maintaining the vessel that could be performed without affecting the structural and watertight integrity of the vessel are . . . not included as parts of the hull or superstructure."  60 Fed. Reg. at 17291.[22]  This interpretation of the regulation is not "plainly erroneous or inconsistent with the regulation."  *Auer*, 519 U.S. at 461.  Furthermore, under this deferential standard, the Coast Guard reasonably concluded that the installation of the auto platforms and ramps—which were bolted in place and/or set in foundations, rather than being welded to the hull—did not constitute work performed on the hull or superstructure.  The exclusion of the weight of the auto platforms and ramps, therefore, is neither plainly erroneous nor inconsistent with the regulation.  *See Auer*, 519 U.S. at 461.

---

[22] Plaintiffs appear to misread the Coast Guard's construction of the regulation in its Notice of Proposed Rulemaking ("NPRM").  While plaintiffs assert that the Coast Guard's announcement of the regulation defined "outfitting" as "inventory, equipment, furnishing, and stores," a close reading of the NPRM reveals that the Coast Guard treated "items involved in outfitting" as a category separate from "inventory, equipment, furnishing, and stores."  60 Fed. Reg. at 17291.  Therefore, plaintiffs assertion that "no one can seriously contend that the auto platforms below the Second Deck and fixed ramps are 'inventory, equipment, furnishing and stores"—although accurate—misses the point.  Pls.' Mem. in Support of Summ. J. 20.  No party contends that the platforms and ramps fall into this grouping; rather, Matson asserted, and the Coast Guard reasonably accepted, that these items are "outfitting."

More generally, plaintiffs argue that the Coast Guard failed to verify independently that Matson's description of the work performed in China was accurate, and that the Coast Guard acted arbitrarily and capriciously by simply accepting Matson's representations at face value, rather than requiring supporting documentation that would have enabled the agency to verify Matson's calculations. In particular, plaintiffs argue that differences between Matson's two requests for a preliminary determination and its request for a final determination should have aroused the Coast Guard's suspicions.[23] Yet, there is no basis for a finding that the Coast Guard acted arbitrarily and capriciously on this ground. Indeed, on referral from the NVDC, the NAD specifically addressed the differences between Matson's 2004 request and its 2007 request, concluding that "the differences between the 2004 weight estimate and the 2007 final estimate are reasonably accounted for." A.R. 249.[24] As for plaintiffs' more general argument that the Coast Guard should have required Matson to submit supporting documentation that would have enabled the agency to verify Matson's estimate of the weight of the relevant work, the Coast

---

[23] In its 2004 request for a preliminary determination, Matson's submissions showed that the foreign work would take place between frame 190 and frame 125, and that the relevant work would weigh 815.5 LT. *See* A.R. 6-7. In its 2006 request for a preliminary determination, which was withdrawn approximately a week following submission, Matson still represented that the work would take place between frames 190 and 125, but stated that the weight of the relevant steel work would be 974.8 LT. *See* A.R. 29-30. In its 2007 request for a final determination, Matson indicated that, in addition to the initially planned work between frames 190 and 125, work had also been performed in China on the upper deck between frames 214 and 190, and that the total weight of the relevant work was 891.0 LT. *See* A.R. 73–74, 248.

[24] It appears that plaintiffs' real complaint is that the Coast Guard did not require Matson to explain the 83.8 LT decrease between the estimate of relevant steel work in the 2006 request and that in the 2007 request. Matson withdrew its 2006 request about a week after it was submitted, however, and the Coast Guard certainly acted within its discretion when it allowed Matson to do so. It would have been odd, then, to require Matson to explain the difference between the 2007 request and the withdrawn 2006 request.

Guard acted within its discretion when it accepted Matson's calculation. Although the Coast

Guard certainly had the authority to request supplemental submissions,[25] it reasonably relied on

Matson's representations given the stiff penalty—seizure and forfeiture of the vessel—that

Matson would face for making a knowing misrepresentation. *See* 46 U.S.C. § 12151(b)(1) ("A

vessel and its equipment are liable to seizure by and forfeiture to the Government if the owner of

the vessel . . . knowingly falsifies or conceals a material fact, or knowingly makes a false

statement or representation, . . . in applying for documentation of the vessel . . . ."). In short, the

Coast Guard did not commit a clear error of judgment when it found "no credible basis to reject

the steelweight calculation presented in [Matson's] application." A.R. 244.

**2.**

Next, plaintiffs challenge the Coast Guard's decision to include only the weight of steel

*added* to the *M/V Mokihana* in its calculation of the weight of work performed on the vessel's

hull or superstructure under 46 C.F.R. § 67.177(b), while disregarding the weight of steel

*removed* from the vessel. Plaintiffs submit that because the total amount of steel added *and*

removed totals 1,343 LT, a figure equivalent to 11.1% of the vessel's lightship weight, the *M/V

Mokihana* must be deemed rebuilt foreign under 46 C.F.R. § 67.177(b)(1). The Coast Guard

responds by asserting that—as it indicated in its final rebuilt determination to Matson—its

longstanding practice is to "calculat[e] steelweight by using the greater of the steel removed or

the steel added," and that this practice is due substantial deference. A.R. 242.

The Coast Guard's interpretation cannot be said to be plainly in error or inconsistent with

its own regulation, as 46 C.F.R. § 67.177(b) does not specify the manner in which steelweight

---

[25] *See* 46 C.F.R. § 67.177(e)(4).

-34-

must be calculated. *See Auer*, 519 U.S. at 461. In response, plaintiffs unpersuasively argue that four Coast Guard letter rulings narrowed the applicability of the agency's longstanding practice to situations in which added steel replaced existing steel structures, as opposed to building new steel structures. Yet, these letter rulings do not support plaintiffs' inference that a brightline distinction has been drawn between replacement work and new construction work; the agency did not indicate its intention to exclude only removed steel as part of work done under the considerable part test when steel structures were replaced, or conversely to treat uniformly removed steel as part of the weight calculation whenever new structures were built.[26] Indeed, the Coast Guard has made clear that "every rebuilt determination is evaluated on a case-by-case basis." 60 Fed. Reg. 17290, 17291 (Apr. 5, 1995). In any event, these private letter rulings do not control here because "a letter's binding character as a ruling stops short of third parties." *Mead*, 533 U.S. at 233. Accordingly, in this case the Coast Guard's determination cannot be said to contravene the language of its regulation, and therefore the agency did not act arbitrarily and capriciously.

### 3.

Plaintiffs next complain that the Coast Guard relied upon Matson's incorrect calculation of the vessel's steelweight prior to commencement of work. Specifically, plaintiffs assert that the Coast Guard and NAD should not have accepted Matson's calculation and rejected plaintiffs' calculation without conducting an independent investigation, and that this failure to verify information submitted by Matson constitutes reversible error.

---

[26] It is also worth noting that the 1995 letter cited by plaintiffs predates the Coast Guard's 1996 promulgation of the weight thresholds now set forth in 46 C.F.R. § 67.177(b).

A similar argument—namely, plaintiffs' contention that Matson should have been required to submit documentation supporting its estimate of relevant foreign work weight thereby enabling agency verification of Matson's estimate—has been rejected above on the ground that the Coast Guard acted within its discretion when it accepted Matson's calculation. Likewise, here, although the Coast Guard could have requested additional information from Matson,[27] agencies are ordinarily not required to undertake independent investigation of applicants' factual representations.[28] In addition, courts have held the Coast Guard's reliance on applicants' representations to be reasonable given the seizure or forfeiture penalty for making a knowing misrepresentation under 46 U.S.C. § 12151(b)(1). *See id.* at 1404 (quoting Bowaters bill House of Representatives Report, which concludes that "a provision for appropriately severe civil penalties against the vessel and the corporate officers" is favored over a requirement of "extensive investigation"); *Manhattan Tankers, Inc. v. Dole*, 596 F. Supp. 974, 988 (D.D.C. 1984) (recognizing that forfeiture provision is "[the Jones Act's] own built-in safeguard").

More fundamentally, the Coast Guard based its acceptance of Matson's estimated discounted lightship weight on reasoned analysis, contrary to plaintiffs' suggestion that the rejection of their proposed calculation was "devoid of any analysis." Pl.'s Br. at 27 (quoting *The*

---

[27] *See* 46 C.F.R. § 67.177(e)(4).

[28] *See, e.g., Crutchfield v. City of Hanover*, 325 F.3d 211, 223-24 (4th Cir. 2003) ("For us to require the Corps to do such independent studies rather than reasonably relying on extensive studies given to them by applicants 'would place unreasonable and unsuitable responsibilities on the Corps,' which receives thousands of permit applications per year." (quoting *Friends of the Earth v. Hintz*, 800 F.2d 822, 834-36 (9th Cir. 1986)); *Ingram Barge Co. v. United States*, 884 F.2d 1400, 1403-04 (D.C. Cir. 1980) ("Regardless of whether the Government is permitted to conduct some such investigation and to deny a Certificate of Compliance based upon its findings, we conclude that Congress plainly did not intend to require it to do so.").

*Seabulk Trader I*, 551 F. Supp. 2d 447, 457 (E.D. Va. 2008)).  Well short of simply accepting at face value Matson's representations, the Coast Guard enlisted NAD's technical expertise for the express purpose of determining whether Matson's or plaintiffs' discounted lightship weight estimate was correct. *See* A.R. 212-13 ("It is the reasonableness and likely accuracy, or not, of those calculations, in light of all the material provided to you [from both Matson and plaintiffs], which we request that you review and assess.").  Following this review, the NAD justified its rejection of plaintiffs' calculation, explicitly stating that plaintiffs' argument was "unrealistic: the final weight of all components of the ship, including the hull, are expected to be heavier than estimated during design and construction." *Id.* 248-49.  By comparison, NAD further concluded that "Matson's approach—to equally [sic] apply the overage to all components—is reasonable under the circumstances." *Id.*  In its final rebuilt determination, the Coast Guard, after quoting NAD's analysis at length and indicating that its own finding was "[g]uided by the NAD evaluation and conclusions," concluded that foreign steel added to the *M/V Mokihana* constituted 7.37% of the discounted lightship weight. *Id.* at 243-44.  Accordingly, there is simply no basis for concluding that the Coast Guard's acceptance of Matson's discounted lightship weight estimate was arbitrary and capricious, as the agency did not consider irrelevant factors or make a clear error in judgment. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Inso. Co.*, 463 U.S. 29, 43 (1983) (citations omitted).

4.

Finally, plaintiffs argue that the Coast Guard incorrectly applied the considerable part test in failing to include as part of the steelweight calculation the portion of the work completed in a Alabama shipyard.  If this domestically-added steelweight were considered under the

-37-

considerable part test, the weight of work on the vessel would increase to 23% of the discounted lightship weight, thereby exceeding the 10% threshold and requiring a determination that the *M/V Mokihana* was foreign rebuilt under 46 C.F.R. 67.177(b)(1). Plaintiff advances two grounds for this argument, neither of which is persuasive: (i) the difference in language between subsections (a) and (b) of 46 C.F.R. § 67.177, *i.e.*, the major component and considerable part tests; and (ii) the agency's failure to resolve in its letter rulings whether, with respect to a bifurcated foreign-domestic phased project, the considerable part test must account for steel added in a domestic shipyard.

As to the first issue, the preamble to 46 C.F.R. § 67.177 clearly states that "[a] vessel is deemed rebuilt foreign when any considerable part of its hull or superstructure is built upon or substantially altered *outside of the United States.*" 46 C.F.R. § 67.177 (emphasis added). Subsection (a), which sets forth the major component test, specifically provides that "a vessel is deemed rebuilt when a major component . . . *not built in the United States* is added to the vessel." 46 C.F.R. § 67.177(a) (emphasis added). By comparison, this italicized language is absent from § 67.177(b), which sets forth the three-tiered considerable part test. Nonetheless, the Coast Guard's decision to exclude steel added in a domestic shipyard from work done under the considerable part test is not "plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461. Because the preamble gives meaning to both subsections (a) and (b), it is reasonable, and not inconsistent with the regulation's terms, that the considerable part test only applies to work done "outside the United States." 46 C.F.R. § 67.177. In addition, the absence of the words "not built in the United States" in subsection (b) is readily explained by the two tests' distinct purposes. Prior to the enactment of the Second Proviso, a discrete, separate

-38-

component—*i.e.*, a major component—could have been constructed outside of the United States and transported to a U.S. shipyard, where it would have been hoisted and affixed to a coastwise-eligible vessel. This created a loophole by which shipowners could contract a significant portion of a rebuilding project to a foreign shipyard, while technically satisfying the Jones Act's prohibition against foreign rebuilding. Consistent with the Second Proviso's goal of closing such a loophole,[29] subsection (a) contains language clarifying that the major component test essentially defines "work" as the construction of the major component itself, not the insertion of the major component into a coastwise-eligible vessel. By contrast, because the considerable part test is concerned with piece-by-piece construction aboard a vessel—which occurs outside of the United States, according to the preamble—and not the addition of discrete, separate components that can be assembled prior to being affixed to a vessel, *see The Seabulk Trader II*, 578 F.3d 234 (4th Cir. 2009), there can only be a singular meaning to the term "work" in subsection (b). Accordingly, any clarification as to subsection (b) would be unnecessarily duplicative of the preamble's clear indication that only work done abroad is prohibited.

Finally, plaintiffs argue that the Coast Guard failed to address definitively in its letter rulings whether steel added during both foreign and domestic phases of a vessel's rebuild should be included in a steelweight calculation under the considerable part test. Specifically, plaintiffs reproduce as an exhibit a 2006 letter ruling inviting the applicant to "expound further on this issue," as the agency had yet to reach a definitive construction of its regulation. *See* Coast Guard Priv. Ltr. Rul. 16713/5/2, at 1-2 (Feb. 22, 2006). Although the Coast Guard did not issue a subsequent letter ruling setting forth whether the considerable part test accounts for steel added

---

[29] *See* H. Rep. No. 86-1887, at 1 (1960), *as reprinted in* 1960 U.S.C.C.A.N. 2664, 2664.

in a domestic shipyard, it is clear with respect to the *M/V Mokihana* final determination that the Coast Guard has decided to consider only construction in a foreign shipyard under the considerable part test. A.R. 244 (basing determination on "foreign steel"). Thus, the issue is no longer open, as plaintiffs' suggest, and the agency has not "entirely failed to consider an important aspect of the problem." Importably, where, as here, an agency interprets its own regulation, that interpretation is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461. Accordingly, there is no basis for finding that the Coast Guard's exclusion of domestic steelwork from the considerable part test is either plainly erroneous or inconsistent with the regulation, and therefore the agency's action cannot be deemed arbitrary and capricious.

## IV.

In sum, as a threshold matter, defendants' motion to dismiss for lack of jurisdiction must be denied because plaintiffs' complaint clearly challenges the Coast Guard's interpretation of the Second Proviso's implementing regulations as applied to the *M/V Mokihana*, not the regulations themselves. Moreover, defendants' and Matson's respective cross-motions for summary judgment must be granted because the Coast Guard's issuance of a certificate of documentation with a coastwise endorsement, based on a final determination that the *M/V Mokihana* was not foreign rebuilt under the major component or considerable part tests, was not arbitrary and capricious. Accordingly, plaintiffs' cross-motion for summary judgment must be denied.

An appropriate Order will issue.

Alexandria, Virginia
December 3, 2009

T. S. Ellis, III
United States District Judge

-40-